UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
DANIEL GALLAGHER,

                            Plaintiff,

                - against -

UNITED STATES OF AMERICA,

                            Defendant.
---------------------------------------------------------- X

**MEMORANDUM DECISION & ORDER**

11-cr-0806 (BMC)
15-cv-6864 (BMC)

**COGAN**, District Judge.

        1.        Defendant *pro se* seeks habeas corpus relief under 28 U.S.C. § 2255 from his conviction, following a jury trial before the late Judge Leonard Wexler, on one count of securities fraud (15 U.S.C. §§ 78j(b), 78ff) and two counts of wire fraud (18 U.S.C. § 1343). Judge Wexler sentenced him to 31 months' custody and five years of supervised release. The Second Circuit affirmed, but because the statutory maximum period of supervised release was three years, it remanded with instructions to enter an amended judgment, which Judge Wexler did. United States v. Gallagher, 577 F. App'x 30 (2d Cir. 2014).[1]

        2.        The facts are integrated below to the extent necessary to discuss defendant's points of error, but to summarize, defendant was convicted of raising nearly $500,000 from investors, and then using about 90% of the money for his personal expenses, including things

---

[1] I believe the instant motion is untimely. When the Circuit remanded and Judge Wexler imposed three years of supervised release (he could have imposed less), defendant had the right to appeal that judgment and so the one-year clock started running again. See Johnson v. United States, 623 F.3d 41, 46 (2d Cir. 2010). However, the Government has expressed the view that the motion is timely, and may therefore have affirmatively abandoned any claim of untimeliness. See Wood v. Milyard, 566 U.S. 463, 474 (2012). The issue need not be determined since I am denying the motion on the merits.

like rent, boat fees, and burning (literally) $100 bills at a restaurant. His personal use of the money was undisputed at trial. His defenses were that the terms of the Operating Agreement allowed him to do that, that the investors did not care if he spent the money on himself even if he wasn't allowed to, and that given enough time, the investors would have made money on the investment or at least covered their losses. It was also proven that in all but a few instances (where he gave an incomplete picture), defendant failed to mention to investors that he had a badly blemished civil and administrative securities industry misconduct record prior to the raise, which several investors testified at trial would have been material to them (although at least one testified that he did not care about getting an incomplete picture). These facts refuted his defenses and made the case against him overwhelming.

3. Defendant's argument on this motion is that he received ineffective assistance of trial counsel. Although he has attempted to break that argument into four separate points, they all converge into one: his counsel did not understand the case. According to defendant, this led to counsel not making the right arguments and not calling enough witnesses.

4. Having compared the trial record to defendant's arguments, it is clear that trial counsel understood the case better than defendant.[2] In trying to come up with some defense against the awful facts, defense counsel, of necessity, pushed the jury right to the edge of the straight-face test, and actually found some purchase there, obtaining a protracted deliberation, an acquittal on one count, and the Government's withdrawal of two other counts when the jury deadlocked on them. Some of defendant's arguments on this motion, in contrast, have no

---

[2] Neither party filed the trial transcript. I have reviewed it from the Second Circuit's docket on direct appeal. In doing so, I note that on some of the trial days, the Court Reporter misnamed the trial judge, substituting Judge Hurley for Judge Wexler.

reasonable basis, and others could not conceivably have changed the result absent an irrational jury.

5.  The onerous standard for proving ineffective assistance of counsel is hornbook law. A petitioner claiming ineffective assistance of counsel must prove two things. First, petitioner must prove that counsel's representation "fell below an objective standard of reasonableness" according to "prevailing professional norms." Strickland v. Washington, 466 U.S. 668, 688 (1984). Second, petitioner must prove that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694; see also Hill v. Lockhart, 474 U.S. 52, 58-60 (1985). In other words, petitioner "must show that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687. "The decision not to call a particular witness is typically a question of trial strategy that [reviewing] courts are ill-suited to second-guess." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (per curiam). Because courts are "especially hesitant to disturb such 'strategic' decisions," Pavel v. Hollins, 261 F.3d 210, 217 (2d Cir. 2001), "[c]ourts applying Strickland are especially deferential to defense attorneys' decisions concerning which witnesses to put before the jury." Greiner v. Wells, 417 F.3d 305, 323 (2d Cir. 2005). Thus, a trial "counsel's decision as to 'whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation.'" Id. (quoting United States v. Best, 219 F.3d 192, 201 (2d Cir. 2000)).

6.  Defendant's first argument is that defense counsel failed to understand that the offering documents (an Operating Agreement and Confidential Term Sheet) allowed him to take 90% of the investors' money for his own personal use, and that defense counsel should have made this argument to the jury. Just to state the argument shows its absurdity – for it to be true,

these offering documents would have to be the most peculiar documents in financial history. If they said what defendant asserts they said, an investor would have to be cognitively impaired to invest based on them.

7. But the offering documents were not absurd at all. They were received in evidence on the Government's offer at trial. They expressly provided that defendant would have no right to receive *any* compensation until his investment company raised $1 million, and it was undisputed that the investment company never raised $1 million.

8. The essence of defendant's argument is that as managing member of the investment company, the Operating Agreement gave him the right to change its terms. The argument is so convoluted that it needs to be deconstructed to be understood. To avoid disclosure of his tainted record in the securities industry, petitioner initially named another person to be managing member of the company. There were two individuals who held this role. Each resigned in outrage (as they testified) when they learned of defendant's continuing embezzlements, ultimately forcing defendant to become the managing member. Seeking to turn a sow's ear into a silk purse, defendant contends, as managing member, he could authorize his own personal use of 90% of the funds raised. There are so many problems with this argument that it is hard to know where to start.

9. First, the record was undisputed that the far greater part of the embezzlement occurred before he became managing member – as noted, his embezzlement was the reason each of his predecessors resigned. So defendant wants his attorney to have argued not only that defendant had the right to take the money for his own use, but that he had the right to ratify *nunc pro tunc* that which would otherwise have been improper. Nothing in the Operating Agreement said that.

4

10. Second, the ability of the managing member to change the terms of the Operating Agreement, as one would expect, was not unbridled. The Operating Agreement contained the standard clause in private placements allowing a change only if it "does not adversely affect the rights of any member" and did not "discriminate among the members." A 90% embezzlement does not quite appear to satisfy these conditions.[3]

11. Third, and ironically, defendant's counsel came as close to making the argument that defendant says he should have made as any reasonable lawyer could. In his closing argument, counsel asserted that even though defendant was not the managing member when some of the embezzlement occurred, defendant was the *de facto* manager of the investment company, and it was this very fact that gave defendant the right to "amend" the Operating Agreement to permit his personal use of the money. Defense counsel specifically directed the jury to § 8.04 of the Operating Agreement (even though defendant's § 2255 motion asserts that counsel was ineffective for not doing so). Counsel argued that the legally-appointed managing members were managing members "in name alone. [Defendant] was the real managing member . . . . So [defendant] controlled the money as managing member . . . . [Defendant] had the right to amend the agreement as managing member to take a salary."

12. I do not see how defendant could have expected his counsel to go any further than this. I therefore reject his point that counsel was ineffective because he "failed to call witnesses to explain and interpret the meaning and powers of the Managing Member (Movant/Gallagher)." Defendant does not identify who these witnesses would be (other than himself, discussed below),

---

[3] Contrary to defendant's argument, the "Special Situation" term listed in the Confidential Term Sheet (not in the Operating Agreement) did not give the managing member or any other member the power to take certain actions, but instead explained that "[t]here exists the risk that the transaction [] will be unsuccessful, take considerable time or will result in a distribution of cash or a new security the value of which will be less than the purchase price to the Company . . . ." The "Special Situation" provision therefore did not grant defendant any special authority separate from that conveyed in the Operating Agreement, let alone the right to embezzle.

5

but trial counsel's strategic decision to make these arguments to the jury instead of presenting witnesses who would either have been incompetent to give opinion testimony or would have been subject to wilting cross-examination was well within counsel's discretion.

13. A second, related point of error arising from defense counsel's alleged misunderstanding of the investment transactions is that counsel failed to call several investors who would have testified that they were happy with the way their investment came out. They were happy because, in fact, as investors called by the Government testified on cross-examination, they had received substitute stock of Watt Fuel Cell which at least had a chance to do better than the one targeted in their initial investment. Defendant contends that his counsel failed to realize that defendant's creation of the company Watt was a "Special Situation," as defined in the offering documents, which permitted defendant to substitute Watt stock for his investors' stock in his former company.

14. As Judge Wexler observed at sentencing, this sleight-of-hand transaction was probably itself a separate securities fraud. Watt's managers had made it clear that they did not want defendant involved in any capital raise or otherwise with their company because of his history of securities fraud and the disclosure it would have required. So they agreed to grant one million shares to defendant's father Patrick, a former NSA employee, who had, at least, a clean reputation (defendant, in turn, touted his father's government connections as an investment enhancement, although his father testified at trial that he "absolutely [did] not" say that he would use such connections to help Watt). Patrick inconsistently testified that while he had legal ownership of the stock and the right to do with it as he saw fit, he was, in effect, serving as a nominee for defendant.

15. In another irony, the only reason these investors received this stock is because defense counsel persuaded Judge Wexler, over the Government's strong objections, to grant two trial extensions. During this interim period, defendant, facing a federal felony trial, was able to persuade his father to distribute his Watt stock which, unknown to defendant's father until that time, defendant had already promised to his investors whose money defendant had used to support his lifestyle.

16. Defendant's father sent a letter to investors telling them that he would distribute the stock to them in light of the promise of his son, the defendant, although the father disclaimed in the letter any legal obligation to do so. Thus, by the time of trial, these investors had already received a partial distribution of Watt stock. Six investor-victims called by the Government, and one called by defendant, testified that they were very pleased with that, preferring it to getting their money back, and expecting that they would receive two more distributions, as defendant's father had represented. Without the two trial delays engineered by defense counsel, these investors could not have so testified, and would have simply been victims with no restitution or prospect of it.

17. In another permutation of this "failure to call necessary witnesses" point, defendant asserts that counsel did not investigate or call 30 witnesses that defendant had identified for his counsel a month before trial, who would have "exonerated" him. In particular, defendant asserts that his counsel should have called Dr. Caine Finnerty to testify on his behalf. But the jury heard all about Finnerty. He was the engineer that defendant brought to Watt to give it legitimacy. It is entirely speculative to think that Finnerty could have added anything further to help defendant, although it is a near certainty that he would have professed ignorance

of a number of damaging facts, either with regard to the subject transaction or defendant's history of industry misconduct.

18. As far as the other 29 witnesses, defendant has failed to show how anything they said would not have been cumulative in light of both the testimony his counsel obtained from investors on cross-examination as well as the investor whom defense counsel called on defendant's behalf. These are people well known to defendant, yet his motion offers no more than speculation on how, if at all, they could have helped him; it seems clear that many lacked sufficient knowledge of his actions and background and therefore would more likely have hurt defendant's case.

19. Finally, defendant contends that his counsel erred by not calling him as a witness. There was a reasonably extensive dialogue between defendant, his counsel, and Judge Wexler in which it was made very clear to defendant that the decision to testify was defendant's alone. He said that he did not want to testify. Having knowingly and intelligently waived the right to testify, he cannot change his mind now. See, e.g., Mendez v. Connolly, No. 05 CIV. 1979, 2006 WL 464045, at *6 (S.D.N.Y. Feb. 23, 2006).

20. The motion [103, as supplemented by 106] is therefore denied. Defendant has failed to make any substantial showing of the deprivation of a constitutional right, and so a certificate of appealability will not issue. See 28 U.S.C. § 2253(c). An appeal would not be

taken in good faith, and so *in forma pauperis* is denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

**SO ORDERED.**

<pre>                                        _____
                                                      U.S.D.J.</pre>

Dated: Brooklyn, New York
       June 26, 2018